Good morning, Steve Hormel on behalf of Mr. Grovo. I raised – How are you going to divide your time? Ten minutes per appellant, Your Honor. Okay. Do you want to put – would it be helpful if I had the court put ten minutes for you? Yes, Your Honor. Thank you. Your Honor, on behalf of Mr. Grovo, I raised six issues in my opening brief. Issue number three relating to the failure to allege an overt act, I will submit that on briefing, and I believe the United States v. Skillman 922 Fed 2nd 1370 may actually resolve that issue,  and that was cited by the government in their answering brief. Do you agree that those pretty much wipe you out? I think Skillman, which is a case I missed in my briefing, may address – may answer that issue, Your Honor. Thank you. Also, I will leave on the briefing issue number six, which is the substantive unreasonableness of the sentencing. I think that the facts are pretty clear and the arguments are pretty clear in the briefing. Your Honor, as far as issue number five relating to restitution, the government filed a 28-J supplemental letter supplementing the authority United States v. Golan case, and I believe that's at 804 Fed 3rd 1287. Your Honor, I believe that case addresses the issues that were raised as far as restitution and that their – the district court did not disaggregate the overall restitution or the overall figure of loss, and so I believe for that reason that this case should be remanded, but I believe the Golan case that came out in November does resolve that issue. Judge Malloy rather clearly didn't disaggregate, correct? Yes, Your Honor. So I'd like to reserve most of my time for addressing the first – or three issues, and the first issue is whether or not there was sufficient evidence to convict Mr. Grobo of the child exploitation enterprise under 2252 large A G, section G, Your Honor, and is our contention that the evidence wasn't sufficient to show that he acted in concert with three or more persons as required by the statute, even if the law, as the Sixth Circuit case in Daniels says, is that you can aggregate the individuals who are acting in concert. In this case, I don't believe the evidence is sufficient to show that Mr. Grobo acted in concert with more than one person throughout the course of his involvement in the – in this bulletin board. And in my opening brief, I analogize the situation to subscribing to an online news service where you either pay a subscription fee or you become a member of an online news service and the journalists write articles and post those articles in the service and the members of the subscribers have the opportunity to comment or not comment on it. The individuals who are subscribers aren't acting in concert with the person who writes the article and submits it for review and for posting on these news – online news services. The people who are reading these articles are reading it at times that they select to read it, are commenting at times that they select to read it, and they're not acting in concert. So – and that's exactly what we have with this Kingdom of Future Dreams bulletin board is you have an administrator and you even have maybe multiple administrators or maybe multiple moderators, but I looked in the record to see if there was any evidence that Mr. Grobo had knowledge that there was more than one administrator or that there was such things called as moderators, and I could not find anything in the record, at least from my review, that indicated that the government proved that Mr. Grobo had knowledge that there was more than one person who was responsible for approving these posts or allowing access to these posts or anything else. So I would – so I believe that's a significant fact in the CCE cases, whether or not the – Are you talking about the split between actual and by knowledge? Inferred? Yeah, and I thought about that, Your Honor. I thought, well, is there some way that Mr. Grobo can infer that there's more than one administrator or more than one moderator, and this is a closed membership, and I believe the membership is the government indicated was some 40-odd individuals. So not a huge membership of this bulletin board. I'm not sure that just the fact that there are other members of this bulletin board leads to inference that there's more than one person that's administering this bulletin board. I believe that if you're a subscriber to a large online news service, that inference may be better, but when you're talking about a very limited private bulletin board with very few members, you know, relatively few members, I'm not sure that same inference applies, and I know that the government presented evidence as to what the structure was. There's no doubt the government admitted evidence as to what the actual structure was, but what I looked in the record for was what evidence was there that Mr. Grobo himself knew what that structure was, or was he just found this bulletin board, allowed to be a member of it, and then was at some point, according to the evidence, allowed to go into the higher levels of the bulletin board where most of the illegal activity was taking place, but there's no evidence that he knew that more than one person was allowing him to do that, or allowing whatever post he had to be placed in any particular place. So my point is that when Mr. Grobo is either posting something to the bulletin board, like posting a notice to go somewhere and see something, he's acting alone. If somebody on the other side is approving it, he doesn't know that there's more than one person involved in this process. So he's posting his own information to rise to this, quote, higher level. Surely he knows that somebody else is going to approve what he's doing. That may prove a conspiracy of one person, but it doesn't prove an aggregate of three or more people involved in the separate incidences that Mr. Grobo may have been involved with. And most of the government says that he posted over 300 times. Well, he posted comments on several. The only time I saw him, there's only one or two incidences in the record, and I don't have that in front of me, but he actually posted a notice of where to go to find this material. When he enters his closed community, though, he knows it's a closed community, but it's a community, right? It is a community, Your Honor, yes. Yeah, and he knows there's more than one or one other person. Yes. He's getting into a chat room, isn't he? Kind of. Is that the analogy? I'm not familiar with this. I think it's an analogy. I do think the online news subscriber is more akin because you can choose to comment or look or not read or view or whatever. Are the comments that are being made readable by others? Yes, in fact, they can comment back and forth. Yeah. That's true. Wouldn't he know that there are more than three people participating in this dialogue? I think what he would know is there's more than one person who may have access to it, but when he actually posts something, a comment, he's only posting himself personally. He has no control. He's not working in concert with anybody when he posts a comment. His comments are being picked up by, does he not, that his comments are being picked up by others in this? He knows they could be, but, again, it's the receipt, the distribution, or the access to view, the child pornography, which is the substance of the CEE. I know. So when you look at the individual conduct that he's doing, when he's doing it, he's not acting in concert with anybody. I think that's what the — Do you think he has to know that there are three or more? Or there really has to be an agreement? Well, I think — I do think that he, under conspiracy law, my understanding is he does have to have some knowledge of the extent of the conspiracy or the agreement that he's entering into. Right? He doesn't have to know all — in a common conspiracy, he doesn't have to know even all the ultimate names of the — who's in it. I agree. He doesn't have to — The statute here says they have to — he has to have agreed in common enterprise. Now, does he have to know that he's got three other people, or does the fact just subject to the jury determining that they were? And I think that's a good point, Your Honor. You do not have to know who the other players of a conspiracy are. If you have an agreement, but the agreement has to be the understanding that there are other players out there that are doing these things. And there's no evidence submitted by the government that Mr. Grobo would know there's more than one administrator or there's moderators or anything of the sort. You still have to kind of know that there's a bigger thing than what your individual involvement is. At least that's my understanding of conspiracy law. Okay. The — Your Honor, I believe the double jeopardy issue and — well, the advertising issue, I — can I just address that one second, or am I eating into — You're eating nerds for her time. I'll give you a minute for a rebuttal. May it please the Court. I'm Elizabeth Brandenburg for Appellant Joshua Peterson. I'll try to address the issues as well and reserve a minute or two for rebuttal. Sure. I'd like to start off with venue in this case. This case is an instance of government overreaching in where the government chose to charge Mr. Peterson, how they chose to charge him, and then how they delineate the proof that they used in trial of his charges. Venue, there is no connection to Montana in this case other than the main administrator, Mr. Wenswick's, domicile in Montana, that he lived there. The government did not present sufficient evidence at trial that any acts on the board took place in Montana. The global nature — He also had computers and electronic media in Montana. He has them there, yes. But I think why — the reason that the government tries to connect the case and the conspiracy allegations to Montana is the very reason why they can't. Because the Internet can be accessed anywhere, it's not sufficient. But because it can be accessed anywhere, Mr. Wenswick could have been anywhere when he was acting in the manner that he did on the board. Circumstantial evidence that he was in Montana. That he lived there, yes. And had his computer and had his files there. So isn't it a reasonable inference that he wasn't moving out of Montana when he was next door in a different state when he was hosting this website? Perhaps, but there's no way to know that. The government — Circumstantial evidence. Well, Your Honor, I think venue is a rather — usually a rather easy thing to prove. And the correct questions weren't — just weren't asked in examination of the agents of where things took place. As to how the case was actually charged is another instance of overreaching. The indictment simply doesn't rise to the level necessary to inform and give Mr. Peterson notice of what he was being charged with in order to prevent a double jeopardy that actually, I think, took place in this case. But even from a subsequent double jeopardy, other charges to be brought later, the indictment did not sufficiently protect Mr. Peterson or notify him of what he was being charged with. Although it does track the language of the statute, that is not always enough when there's not sufficient facts to be — to put the defendant on notice of what — What did he need to know? He was not — they did not identify the predicate felonies in this case, which is important because the CE statute requires a series of felony violations. And not knowing what those felony violations are is incredibly important. The government cites the Weiersky case from the Eleventh Circuit both in this issue, but it's also relevant in the double jeopardy issue. In Weiersky, again, the defendant was charged with a count of CEE as well as a count of advertising conspiracy. And the court found that that indictment was sufficient because the indictment also charged the defendant with three additional felonies. So those three predicate felonies could be used to save the count of the CEE. But that's not — we don't have that in this case. We have one additional predicate — one additional felony, and that's the advertising. And on the government's own arguing of the double jeopardy issue, they keep those separate. So there's not even one predicate felony found in this case. The government argues that — I'm sorry. What was the case you — Weiersky from the Eleventh Circuit. That case goes on to find a double jeopardy violation because of the advertising count. The advertising conspiracy is a lesser included offense of the CEE, that it couldn't be used to — that it violates double jeopardy in that sense. The advertising is part — or the acts that could constitute advertising is part of the notice — or, excuse me, is part of the series of felony violations for the CEE. If the government is allowed to sustain the conviction and sentence for advertising in this case, then there's nothing to prevent the government from piling on charges and saving three felonies or three acts to support a CEE charge. So then you — we could end up with advertising, possession, receipt, distribution, all separate conspiracies alleged by the government, and then — I'm sorry. Hold on a second. Sure. Even though I didn't smoke. Sorry. It's Montana. That's okay. So the piling on of the charges, there's nothing to prevent the government from doing that if they are — if the violations here are allowed to — are sustained. And Wierski is directly on point there. And the two issues, the insufficiency of the indictment that we raised and the double jeopardy that we've been allowed to join on Mr. Grovo's argument on, is — Wierski is relevant because it goes one way and then another. But we are able to distinguish Wierski because their indictment is more particular — particularized than ours is. The government essentially would rather like to have its cake and eat it, too, that make the indictment kind of broad so as to possibly not violate double jeopardy and then specify what facts are used for the advertising conspiracy and the CEE at the end, saying that, well, we don't need these facts for the CEE, so they go to the advertising enterprise — the advertising conspiracy. We've also raised insufficiency of the evidence, both of the CEE and the advertising conspiracy. And I'd like to add that the CEE, again, if we are allowing the government to make what happened in this case a CEE, then it really kind of eviscerates any other conspiracies. You know, anybody that gets online and looks at this illegal material or consumes it or, you know, is a viewer of it, then it makes possession and distribution rather superfluous. If what my client did in this case with the click of a mouse is distinguished from what another person does with their click of the mouse, but the difference is a 15-year mandatory minimum, then we're looking at eviscerating those conspiracy convictions and offenses for distribution and possession, that if this is not typical use of what, you know, a CP viewer does, then I don't know what is. And so making that into a CEE in an effort to raise the mandatory minimums is, in essence, the overreaching of the government. If there's nothing further, I would like to reserve the remainder of my time. Thank you. Good morning. May it please the Court. My name is Cindy Peterson. I'm an assistant United States attorney for the District of Montana, and I'm here on behalf of the United States. But how do you respond to Mr. Harmel's comment that he couldn't find anything in the record, that Grobo knew he was acting as a three or more? That's not required. Knowledge does not go to, if you look at the specific elements of the child exploitation enterprise, knowing that three or more others is not an element. So Mr. Grobo did not have to know. The knowing mental part of the statute comes into play with whether he knowingly distributed, received, or accessed, and whether or not he knowingly received or distributed, I'm sorry, knowingly received, distributed, or accessed on three or separate incidents. That's it. So we didn't have to prove. That's number one. Number two, if you look at the trial exhibits themselves that we put in, and specifically with regards to the ones that Mr. Grobo was commenting on, there are times when there are more than three people that are commenting and are within the same thread. But you don't need to get there, you're saying. I don't even think. All he has to be is with three or more. It doesn't make any difference whether he knew it was one or 70. That's exactly right, Judge. That's exactly right. And I think that the ‑‑ I believe that we cited the court to a Fifth Circuit case, Cuff, that talked about how the administrators and the moderators in and of themselves were enough to meet that minimum threshold. And in this case, we put in the record that there was three and at one time possibly four administrators, and there were moderators, and so it was clear within the membership that there were multiple other people involved, and certainly more than the three or more. But his knowledge is irrelevant. So, Your Honor, there was also the issue on whether or not we met our burden with regards to venue and that the government was overreaching. And there was a statement made that Mr. Wentzowich could have been anywhere, but he wasn't anywhere. He was in Montana. And, again, as it relates to these defendants and Mr. Peterson specifically, we put trial exhibits in, again, where he was directly communicating with Mr. Wentzowich. So not only was Mr. Wentzowich acting, set up the board, created the board, administered the board, did all of these things right within Montana for over three years, but then the communications themselves were going in and out of Montana. How did he know Wentzowich was in Montana? We put that in through the testimony of Agent Damath, Your Honor. How did he know? That is, how did the knowledges? No, Judge, I don't think that you have to know where the other defendants are located in order to get venue at all. And so I don't think that's one of the requirements. And we cited to some cases in our brief that discussed telephone calls. You don't have to set foot in the state in order to have the state have venue over your criminal actions, and I believe that was Gonzalez. And so while Mr. Peterson says, I've never been to the state of Montana, that's not the test. So we believe that venue was appropriate. We believe that we proved it and met our burden in this case. You're on the double jeopardy. You have two statutes involved. Is that correct? I do, Your Honor, and I would like to spend most of my time. I do want to hit on restitution, but I want to spend most of my time talking about the double jeopardy issue. Why don't you deal with Galen? Doesn't that require remand? Your Honor, I don't think it does because of the fact that even though the Galen or the Galen case had not come out, Judge Malloy actually addressed desegregation in this particular case. And so when you look. Where did he do that? So he did it, Your Honor, at ER 612. He was citing to the doctor's report that specifically says, the doctor's report stating the costs associated with Angela's continued treatment and care are at least in part related to the continuing traffic in her image, as she is fearful that consumers of pornography in which she is the object will find her and rape her. So he was talking specifically about the consumers as opposed to those that created the original image. He also did it at ER 610 where he expressly referenced the desegregation. And he said they need to be, the damages here need to be separated by the initial abuser as opposed to other abusers. The one thing that could be argued is that the expert reports themselves did not expressly go through and say this is what, these are the damages that are related to the original abuse and these are the damages that are related or are attributed to these particular defendants. But probably because Galen had not come out. But when it comes to the amount, Your Honor, that standard of review is an abuse of discretion. And we don't look at the Galen decision to create an impossible test. We think it can be a difficult test at times, but not impossible. And Judge Malloy specifically went through and talked about from this crime going forward. He didn't go all the way back to her original damages from day one. He talked about the need to separate out the damages caused from the original abuse and these viewers. And then again, he specifically went to the doctor's report talking about the difference in the standards. And when he did that, he came up with an amount that it wasn't trivial. It wasn't arbitrary. It was thoughtfully calculated. And so because of that, Your Honor, we're requesting that the court affirm the restitution judgment. With regards to double jeopardy, Your Honors, so there are basically two different issues that are sort of provided together in the same argument. And the secondary part of it is the double jeopardy issue that's under the Blockburger test. But before you really get to that, the defendants have argued that there was just one agreement. There was just one conspiracy, not two, as we have alleged. And so the first thing I would say is that it's the defendant's burden to prove that there were – that two charged conspiracies are, in fact, one agreement. And they have to prove that both agreements are indistinguishable in law and in fact. And the Ninth Circuit, as well as the Supreme Court, has specifically said that just that there's some interrelation in the facts does not make it the same enterprise. Because of that, we charge these separate because when you look at the specific facts of this case and you look at the defendant's conduct, they were distinct and it was separate. And so I'd like to take a couple minutes just to talk about the board itself because that part of it is really important. And the defendants have tried – Mr. Grovo and Mr. Peterson have tried to say this board was just one great big agreement. But it actually wasn't. And there are a couple issues with that. So when you entered the board, there was an upper level and a lower level. And there were different rooms within those boards. Every room had its own set of rules. And you had to go in to those separate rooms and agree to those separate rules. So you didn't have to go into every room. And there were rooms where child pornography was not on the board. There were – and I can give the Court some citations to that. But there were rooms that were directed only to security, how to evade law enforcement. There were rooms where they just talked about news and important discussions about what was going on with some other boards. There were rooms that only portrayed the children's faces, things of that nature, not child pornography at all. And if you look at Mr. Peterson's argument in his brief, it actually backs up the way the government charged. Because what he says is, I didn't join this board to look, distribute, receive, advertise child pornography. I got into it because it was modeling. And they didn't prove otherwise. Now, we did prove otherwise. And we put specific exhibits in where he was dealing expressly with child pornography. But the point is, you could have been a member of this board and not been convicted of the enterprise. Similarly, you could have been a member of the board and not been convicted of the advertising. So within one of these rooms, it was called the wishing well. And when we looked through the specific conduct on the board, the wishing well was really completely different than the rest of the board. The rest of the board was sort of a place where they were coming in, and at least the rooms that went to child pornography, they were coming in and they were saying, here's my child pornography, let's share what we have. So everybody comes into a room and throws their baseball cards on the table. The wishing well was different because the wishing well was a place where the defendants went in and specifically posted the exact images that they wanted. So they were seeking specific images that were not there, that other people had not already voluntarily contributed. So in other words, instead of saying, here's all of my baseball cards and we're all looking at them, they took a step further, and both of these defendants did this, and said, this is the image that I want. Somebody go out and get it for me. So because of that, we thought those two actions were completely distinct and separate. It's the wishing well that is the advertisement, the conspiracy to advertise. Mr. Grovo and Mr. Peterson had to specifically choose to go into the wishing well. So if the board is like a building, just because you walked into the building does not mean that you were conspiring to advertise child pornography. Just because you walked into the building does not mean that you were engaging in a child exploitation enterprise. You walked into the building and you saw a bunch of doors, and on every one of those doors were the rules written. And you had to read those rules, and then you had to choose to go through that door. And they did that when they went into the wishing well. And so that's why, number one, we're talking about two separate agreements with two separate facts. And the district court specifically found that they were proven with different facts. Different facts supported each count. And that's on ER 648, with regards to Mr. Grovo's excerpts of record, that is. So the argument has been made today, and it's made in the briefs, that really this is just an overall reaching agreement to exploit children. And so they're lumping all of child pornography crimes together. But that is not supported by the cases. And it's specifically not supported by the Ninth Circuit in Overton. And a footnote, because that was the case that dealt with double jeopardy, and the defendant there was arguing that it was all child exploitation. And the Ninth Circuit said, no, it's not the same evil. To say that it's all child exploitation is too broad. And I would argue that the Supreme Court did the same thing when they were talking about two conspiracies in the Albernez case. That's a drug case, but it's a case where one count was conspiracy to distribute marijuana, and one count was conspiracy to import marijuana. And the defendants were saying, it's all drugs, it's the same thing. You can't, if you import, you're doing it because you want to distribute. And they said, no. They recognize that there's separate evils involved with these two things. And that's what's going on in this particular case. It's not the same harm. And when you look at these statutes separately, there are different societal harms that are being done. And they are specifically two separate agreements that these defendants entered into. So that's why we don't think that, number one, they're the same transaction or act. Okay. Just to clarify, you're saying the wishing well is what you're ‑‑ that wishing well to get into that was one of the doors? Yes. It was a room. Okay. So it's a room. Okay. You're saying both the enterprise and the advertising, then, are separate events that happened in that room? No, Judge. That's not the way we charged it or the way we presented the evidence. That's what I'm trying to understand. You said there were two separate events. You cite one room. Yes. Is there another room? Yes. Okay. So you relied on two rooms. We did. We relied on other events that were happening in other rooms where there was the distribution and receiving of child pornography. And that's where I was pointing to the fact that the district court saw that, too, and we argued it that way in our closing as well, that we put specific exhibits in with regards to threads that went to the enterprise, and we put specific ones in, specifically the wishing well, that went to the advertising. So that's sort of the first part of their issue, is that there really isn't two agreements. There is just one agreement. And as I said, we proved that that's not true. The second part, then, is that even if you find that it was the same conduct or that it really is just one agreement, then you go into the Blockburger test, which is, does one require proof that the other does not? And, again, when you look at the specific charges, they don't. I mean, they require different proof. And it was possible in this case for Mr. Grovo, for example, to be convicted of one and not the other because they do require different elements of proof. And so because we have specified different ends, we see these as not violating double jeopardy. Now, the third sort of step in that is that if Blockburger applies and they don't punish the same offense because we're getting at different harms, then the next step is, does the legislative history show clear intent to not allow multiple punishments? And on that, number one, I would again point out that the burden is ‑‑ This is in your briefs. It is. It is, Your Honor. And it's the defendant's burden to prove that Congress did not intend. And both the Supreme Court and the Ninth Circuit, again, in Overton, said silence does not mean ambiguity. So there's different harms. We think that the different harms have been proved. I think we understand your position. Okay. Thank you, Your Honor. With regards to the other issues, I think that they ‑‑ we pretty thoroughly argued them in the briefs. I don't want to be repetitive. If there's any other questions, I'm happy to respond. Thank you, Your Honor. Thank you. Your Honor, I think the key to the double jeopardy issue is that it's the same evidence that goes to prove the agreements and the in concert, the members of the ‑‑ who are acting in concert. 2252 Big A.G. says that a predicate offense is any violation of Chapter 110. 2251e is in Chapter 110. It could actually be a predicate for the 2251e. So it's the same evidence that goes to prove the number of characters. The Rutledge case in the conspiracy and in the CEE, the Rutledge case, the Daniels case, and the Wierski case all cited in all the briefing address that very issue. And it is absolutely a double jeopardy violation in our opinion. The advertisement versus notice. I just wanted to say one thing. The Franklin case cited by the government in their brief, it's 785, Feb. 3rd, 1365. I just want to ‑‑ the only thing I want to say is the defendant in that case said that both notice and advertisement had to have a public component. This case is a lot different because we're saying that the advertisement has to have a public component and the notice part doesn't and the government only charged the advertisement. So that's the difference. Again, in regards to the double jeopardy, the government cited Albernaz, which is the United States Supreme Court case, which predated Rutledge, where in Rutledge the two conspiracies were CCE, the continuing criminal enterprise, which encompassed the distribution conspiracy. And that's the situation that we have here, where the child exploitation enterprise encompasses the advertising conspiracy. The Albernaz case, you had importation and distribution, which are on the same level. One does not encompass the other. There's no clear intent, which is what Blockberger requires, that Congress intended to punish both the advertising and the CCE, whereas in importation of drugs and distribution of drugs in Albernaz, it was clear that that's what Congress intended. Thank you. All right. Thank you, counsel. Interesting case. Many issues. It's submitted, and we'll get back to you in due course. Thank you.
judges: Fisher, Watford, Walter